62 F.3d 1415
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael McLYMONT, a/k/a Black, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Betril Mark ROBERTS, a/k/a Mark, Defendant-Appellant.
 Nos. 94-5042, 94-5043.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 9, 1995.
Decided: Aug. 3, 1995.
 
 ARGUED: Timothy Stephen Coyne, FOWLER, GRIFFIN, COYNE & COYNE, Winchester, VA, for Appellant Roberts; Kerry Dane Armentrout, GREEN & O'DONNELL, Harrisonburg, VA, for Appellant McLymont.
 Donald Ray Wolthuis, Assistant United States Attorney, Roanoke, VA, for Appellee. ON BRIEF: Robert P. Crouch, Jr., United States Attorney, Roanoke, VA, for Appellee.
 Before WIDENER, MICHAEL, and MOTZ, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Two members of a drug conspiracy who pled guilty to charges arising from their drug activities appeal their respective sentences alleging that the district court committed various errors. Finding no merit in their contentions, we affirm.
 
 I.
 
 2
 Michael McLymont (Black) and Betril Mark Roberts (Mark) were indicted on February 24, 1993, with eight co-defendants for their part in a crack cocaine conspiracy. Both McLymont and Roberts were charged with one count of conspiracy to manufacture and possess with intent to distribute crack cocaine in violation of 21 U.S.C. Secs. 841 and 846. In addition, McLymont was charged with six counts of distribution of crack cocaine in violation of 21 U.S.C. Sec. 841. Both men, along with every member of the conspiracy except for its leader, Clarence Jupiter, entered into plea agreements and pled guilty to all charges against them.[1]
 
 
 3
 At the sentencing hearing, the district court determined McLymont's base offense level to be 36. The court increased this level two points for possession of a firearm in connection with a drug transaction and an additional three points because of McLymont's aggravating role in the conspiracy; it reduced the offense level by three points because McLymont accepted responsibility for his offense. After these adjustments, McLymont's offense level was found to be 38. Pursuant to the guidelines, McLymont was sentenced to 240 months imprisonment.
 
 
 4
 The district court, modifying the recommended findings of the presentence report, found that Roberts' base offense level was 30. The court increased Roberts' level three points because of his aggravating role in the conspiracy but decreased his sentencing level three points because he accepted responsibility for his crime. Accordingly, his total offense level remained at 30. In accordance with the guidelines, Roberts was sentenced to 160 months imprisonment.
 
 II.
 
 5
 McLymont asserts three challenges to his sentence. First, he claims that the district court's finding that he possessed firearms while engaged in drug activities is clearly erroneous and so his offense level should not have been increased by two points. See United States Sentencing Commission, Guidelines Manual, Sec. 2D1.1(b)(1) (Nov.1994). McLymont concedes that the probation officer "stated in his report that 'evidence reflects that McLymont frequently possessed firearms while distributing cocaine base' " but contends that there is no evidence to support this "conclusion," and so the district court should not have accepted it.
 
 
 6
 Testimony at the sentencing hearing established that McLymont had, on at least one occasion, received a firearm in exchange for crack cocaine. McLymont presented no evidence to support his unsworn assertion that he "never traded guns for dope." A court can resolve factual disputes concerning sentencing by adopting the recommended findings of the presentence report. See United States v. Morgan, 942 F.2d 243, 245 (4th Cir.1991). "A mere objection to the finding in a presentence report is not sufficient" to satisfy a defendant's "affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." United States v. Terry, 916 F.2d 157, 162 (4th Cir.1990). Cf. United States v. Gilliam, 987 F.2d 1009, 1013 (4th Cir.1993) ("the Government carries its burden if a defendant fails to properly object to a recommended finding in a presentence report that the court determines to be reliable"). McLymont did not meet this burden. Accordingly, the district court's factual finding is not clearly erroneous. See United States v. Nelson, 6 F.3d 1049, 1055 (4th Cir.1993), cert. denied, 114 S.Ct. 2142 (1994).
 
 
 7
 McLymont next contends that the district court erred in accepting the recommendation of the probation officer that his offense level be increased three points because he "supervised a number of individuals in the procurement and distribution of cocaine base" and "worked closely with and under the direction of the co-defendant Jupiter who was the overall organizer," and so "was a manager or supervisor (but not an organizer or leader)" of "criminal activity [that] involved five or more participants or was otherwise extensive." U.S.S.G. Sec. 3B1.1(b).[2] McLymont acknowledges that an appellate court can reverse a district court's factual determination of a defendant's role in a conspiracy only upon finding clear error. See, e.g., United States v. Falesbork, 5 F.3d 715, 722 (4th Cir.1993). Nonetheless, he claims that the district court's determination in the present case was clearly erroneous because it was supported by insufficient evidence. McLymont first asserts that the presentence report improperly relied on testimony offered at the trial of his co-defendant, Clarence Jupiter in violation of McLymont's "Fifth and Sixth Amendment Rights to due process under the United States Constitution." In the alternative, he asserts that "[e]ven if the Court properly relied upon the evidence from the trial of co-defendant Jupiter, the totality of such evidence did not warrant a finding that the Defendant had an aggravating role in the offense." McLymont's first assertion is unsupported by law; his second is unsupported by the facts.
 
 
 8
 McLymont's constitutional rights were not violated because testimony from Jupiter's trial was considered as evidence of McLymont's role in the conspiracy. See, e.g., United States v. Notrangelo, 909 F.2d 363, 364-366 (9th Cir.1990); United States v. Romano, 825 F.2d 725, 728-730 (2d Cir.1987). Moreover, there was testimony at Jupiter's trial from another co-conspirator, that "Black[McLymont] was ... Clarence's main [sic], Black would transport most of Clarence's cocaine in Virginia." Furthermore, at the sentencing hearing the probation officer reaffirmed his statement that McLymont "worked closely with and at the direction of Mr. Jupiter; that he was involved with Jupiter [i]n checking out other street dealers and picking up drug proceeds." McLymont's counsel had an opportunity to cross-examine the probation officer on this point, but did not seriously attempt to challenge his recommendation. In sum, there is ample evidence to sustain the district court's decision to increase McLymont's base offense level by three points.
 
 
 9
 McLymont's final argument on appeal is that the government violated his equal protection rights by arbitrarily and capriciously refusing to make a substantial assistance motion on his behalf and that "the District Court's subsequent failure to correct this at sentencing constituted an abuse of discretion by the government and error by the District Court." McLymont correctly notes that "other co-defendants ... were offered and received a reduction in their sentences for substantial assistance." The government's decision to move on behalf of other defendants--but not McLymont--for a downward departure because of substantial assistance was not arbitrary and capricious. The other defendants testified at Jupiter's trial and so provided substantial assistance. McLymont, in contrast, did not testify at Jupiter's trial and only decided that he was willing to testify on the final day of the trial. At that point the government decided, for a variety of strategic reasons, not to elicit his testimony. The government's decision was not " 'based on an unconstitutional motive,' " United States v. Wallace, 22 F.3d 84, 87 (4th Cir.), cert. denied, 115 S.Ct. 281 (1994), and so the district court properly deferred to that decision. See United States v. Dixon, 998 F.2d 228, 230 (4th Cir.1993).
 
 III.
 
 10
 Roberts asserts that the district court "clearly erred in finding that he had an aggravating role in the offense and in increasing his offense level by three points." Roberts recognizes that the district court found that he had a " 'substantial leading role' in the transportation [of cocaine] before he was arrested in June of 1992," but contends that finding is clearly erroneous. Roberts asserts that the district court "relied on the evidence from the trial of co-defendant Clarence Jupiter" and that "reliance on that testimony deprived him of an opportunity to adequately prepare his defense."
 
 
 11
 Roberts relies on United States v. Berzon, 941 F.2d 8 (1st Cir.1991), to support his argument. Berzon, however, was a very different case from the present one. Berzon's presentence report (PSR) had been prepared before the trial of his co-defendant and so the recommended finding in the PSR was not based on testimony offered at his co-defendants' trial. Id. at 19-20. Accordingly, Berzon lacked notice of this testimony and for that reason the First Circuit held that it would be improper for a sentencing judge to rely on that testimony to determine Berzon's role in the offense. Id. at 21. Unlike Berzon, here the PSR was prepared following Jupiter's trial.[3] The PSR in relevant part states: "During the beginning of the conspiracy, Roberts and Jupiter were equal partners. However, as the conspiracy proceeded, Roberts slipped in rank and basically became an employee of Jupiter. Roberts remained a top lieutenant who was totally involved in the day-to-day workings of the conspiracy." The PSR concludes: "Based on the defendant's status within the conspiracy, that [of] being a full partner initially and a top lieutenant at a later date, he qualifies for a three point increase. Pursuant to U.S.S.G. Sec. 3B1.1(b), the offense level is increased three levels."
 
 
 12
 At sentencing Roberts' counsel argued that the probation officer's recommended finding in the PSR was incorrect because the testimony from Jupiter's trial did not support it. He argued: "I don't know where the evidence in the presentence report is coming from ... that he was out there collecting all this money on a weekly basis, and we would certainly object to that." The government, in response, argued that "the evidence of manager ... is before the Court in terms of what Roberts' activity and role were ... [and] within the definition within the guidelines as identified in the presentence report." The court found the government's argument more persuasive and stated:
 
 
 13
 As to the role in the offense, the Court is satisfied from the evidence that it heard that the defendant had a substantial leading role in the transportation before he was arrested in June of 1992, and the Court sees no reason for there to be a role adjustment. Accordingly, no role adjustment will be made.
 
 
 14
 (emphasis added).
 
 
 15
 It is apparent from a review of the transcript of the sentencing hearing that the court was adopting the recommended finding contained in the PSR, and not, as Roberts asserts, "rel[ying] solely on the evidence presented at the trial of co-defendant Clarence Jupiter." The parties directed their arguments to the PSR, mentioning trial testimony only to bolster their respective arguments. In addition, in the sentence prior to his finding as to Roberts' role in the offense, the district judge, in making in his finding as to drug quantity, stated that he "sustain[ed] the objection as to that aspect of the report" and so adjusted the recommended finding. In light of that statement, the district court's subsequent statement that "no role adjustment will be made" indicates that the court was adopting the finding of the PSR. See United States v. Walker, 29 F.3d 908, 912 (4th Cir.1994) ("Given the context, this statement from the bench satisfied the requirements of Rule 32(c)(3)(D). It is evident that, in expressly overruling Walker's objections to the PSR the court was in fact adopting the controverted PSR findings.").
 
 
 16
 The court's statement that it was "satisfied from the evidence that it heard" that a three level increase in Roberts' sentence was appropriate does not constitute improper reliance on evidence of which the defendant was unaware. Instead, the court was merely confirming that the findings in the PSR were supported by reliable evidence, specifically testimony from the Jupiter trial. See United States v. Fetlow, 21 F.3d 243, 249-250 (8th Cir.), cert. denied, 115 S.Ct. 456 (1994). Roberts' offered no evidence to undermine the reliability of the PSR and so the district court's finding was entirely proper. See, e.g., United States v. Gracia, 983 F.2d 625, 630 & n. 21, 22 (5th Cir.1993).[4] Roberts next argues that it was error for the district court to convert the 126.3 grams of cocaine powder attributable to him into cocaine base for sentencing purposes. Roberts asserts that the court should have sentenced him "on the basis of 126.3 grams of cocaine powder ... resulting in a base level offense of 18" because "there was no evidence presented at the sentencing hearing concerning[his] involvement in or knowledge of the manufacturing process utilized in this conspiracy." Roberts is accountable for the conduct of other coconspirators that was in furtherance of the conspiracy and reasonably foreseeable in connection with the conspiracy. See, e.g., United States v. D'Anjou, 16 F.3d 604, 614 (4th Cir.1994). Roberts was a high level participant in what the district court found was "pretty obvious[ly] ... a crack cocaine ring, not just a cocaine ring." Given Roberts' status within the conspiracy, the district court's finding "that it was clear that conversion was not only reasonably foreseeable, it was anticipated," is not clearly erroneous.
 
 
 17
 Alternatively, Roberts claims that even if conversion of powder to crack cocaine was permissible, the conversion in the present case was clearly erroneous because "there was absolutely no evidence presented on the efficiency of the process used in this case," and so the district court's calculation must be rejected. At the sentencing hearing the government presented expert testimony concerning the conversion of powder to crack cocaine. The government's expert first testified that in order to determine the amount of pure cocaine, it was necessary to multiply the gross weight of the powder (126.3 grams) by its purity (73%). In the present case that calculation yielded 92.19 grams of pure cocaine hydrochloride (powder). The government's expert further testified that the conversion from cocaine powder to crack yielded at best 89% of the powder cocaine and that "a 50 percent yield is pretty easily obtained and fairly common." Applying these percentages to the 92.19 grams of pure powder, the expert determined that the range of crack cocaine that could have been produced was "from about 46 grams to 82 grams." On cross-examination, Roberts' counsel did not challenge these calculations but only established that the expert could not state "whether it would be the 50% yield or the 89% yield."
 
 
 18
 After hearing this evidence, the court found: "As to the quantity, I am satisfied that the conversion would yield at least 46 grams, but I am not satisfied that it would be more than 46 grams," and so determined that Roberts' base level was 30, rather than 32 as recommended in the PSR. Roberts' argument on appeal appears to be that because he could have been held accountable for more crack cocaine than was attributed to him this court must reject the district court's conservative determination of drug amounts. This is not the law. The government proved by a preponderance of the evidence that Roberts was accountable for 46 grams of crack cocaine and the district court's decision so finding is not clearly erroneous. See, e.g., United States v. Ricco, 52 F.3d 58, 63 (4th Cir.1995).
 
 
 19
 Roberts further asserts that the district court abused its discretion in assigning him a criminal history level IV rather than a criminal history level III. Roberts does not contend that the district court erred in calculating his criminal history score at 8, but argues that score "significantly overstate[s] the seriousness of his criminal record." The district court specifically rejected this argument stating: "The Court does not find that the criminal history category 4 overrepresents the seriousness of his conduct, past conduct, and there's simply nothing that the Court finds that supports that." The district court's decision not to depart from criminal history level IV was not in violation of the law and so we have no occasion to review it. See, e.g., United States v. Fonville, 5 F.3d 781, 784 (4th Cir.), cert. denied, 114 S.Ct. 1839 (1994); United States v. Bayerle, 898 F.2d 28, 31 (4th Cir.), cert. denied, 498 U.S. 819 (1990).
 
 
 20
 The final issue raised by Roberts concerns the district court's decision not to depart from the guidelines range despite finding that Roberts had rendered substantial assistance. The district court initially stated that it would "depart from the mandatory guideline range," but then proceeded to sentence Roberts to a period of confinement within the guidelines range. Although, "recognizing that the District Court's refusal to depart from a particular guideline range is ordinarily not reviewable," Roberts asserts "that the District Court clearly erred in stating that it would depart, then failing to do so." As noted above, our review of a district court's refusal to depart downward from the guideline range is quite limited. In the present case, it is clear that the district court's refusal was not based on the "mistaken view that it lacked the authority to depart" from the guidelines. Bayerle, 898 F.2d at 31. After his sentencing, Roberts filed a "Motion for Reduction or Correction of Sentence" contending that the district court mistakenly believed that he was subject to a twenty year mandatory minimum sentence. The district court issued an order stating that "it recognized that the mandatory minimum was ten (10) not twenty (20) years and imposed the sentence it intended to impose." Although the district court's initial statement is not entirely consistent with its ultimate sentence, the sentence is not in violation of the law.
 
 
 21
 For all of these reasons the sentences imposed by the district court are
 
 
 22
 AFFIRMED.
 
 
 
 [1]
 Jupiter was convicted of the charges against him following a three day jury trial
 
 
 [2]
 The presentence report erroneously cites to Sec. 3B1.1(c) rather than Sec. 3B1.1(b). It is clear from the recommended increase of three levels and from the corresponding section of co-defendant Roberts' presentence report that the probation officer intended to cite to subsection (b) rather than (c). The applicability of subsection (b) or (c) is determined by the number of persons involved in the offense. There is no dispute that the present conspiracy involved more than five persons
 
 
 [3]
 Significantly, Roberts, himself, testified at Jupiter's trial
 
 
 [4]
 Roberts' argument that the probation officer's addendum to the PSR does not offer further support for the district court's finding suggests a misunderstanding of the permissible sources of information for a presentence report. The addendum responded to Roberts' objection that he should not receive a three level enhancement for playing an aggravating role in the conspiracy. It stated:
 Several statements made by codefendants indicated Roberts was a manager or supervisor within the conspiracy. Codefendant Hayden Goddard stated that Roberts frequently would "come by and pick up the money." Codefendant Singh described Roberts as Jupiter's "right hand man" and stated that Roberts was second to Jupiter in the group's hierarchy.
 Roberts apparently concedes that his codefendants made these statements, but asserts that their "sworn testimony" at Jupiter's trial did not contain these assertions. That is irrelevant. # 7F 79AD# T]here is little limit on the type of information the district court can consider in sentencing.' So long as the defendant has an opportunity to rebut evidence that he believes is erroneous, a district court is generally not precluded from relying on hearsay in sentencing." United States v. Blackwell, 49 F.3d 1232, 1234 (7th Cir.1995). A probation officer can obtain information from, among other sources, witness interviews. Id. at 1235, 1238 n. 6.